**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                    :
WEXCO INDUSTRIES,                   :
                                    :
              Plaintiff,            :
       v.                           :        CIVIL ACTION NO. 04-5244 (JLL)
                                    :
ADM21 CO., LTD.,                    :
PENNZOIL-QUAKER STATE CO.,          :              **OPINION**
d/b/a SOPUS PRODUCTS, and           :
SHELL LUBRICANTS US,                :
                                    :
              Defendants.           :
_____:


**LINARES**, District Judge.

Pending before this Court are cross-motions for summary judgment (Docket Entry Nos. 125, 127, 129, 149, and 156) – brought by Plaintiff Wexco Industries ("Plaintiff" or "Wexco"), Defendant ADM21 Co., Ltd. ("ADM"), and Defendants Pennzoil-Quaker State Co. and Shell Lubricants US (collectively, "Shell"). Having considered the written submissions of all parties, the Court decides the motion without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, Shell's motion for summary judgment is granted in full as to all counts, ADM's motion is denied in full as to all counts against it, and Wexco's motion for partial summary judgment is denied in full as to all counts. Finally, ADM's motion for judgment in the amount of $291,680.30 is granted but the Court stays enforcement of the judgment until the resolution of all claims between ADM and Wexco.

## I.    Factual History[1]

This case presents a classic manufacturer-middleman-wholesaler relationship.  ADM

produced premium-priced windshield wiper blades that were bought and imported into the

United States by Wexco, who then re-sold the blades to suppliers such as Shell.  The following

factual history begins with the ADM-Wexco relationship, moves to the Wexco-Shell relationship

and finally describes the ADM-Shell interactions that took place over the summer of 2004.

### A.    Wexco's Relationship with ADM

ADM is the producer of a variety of high-end, premium-priced windshield wiper blades.

Its relationship with Wexco began in 1999 with the first of three agreements, followed closely by

superseding agreements in 2001 and 2003.  Finally, in October of 2004, the relationship came to

an end.  The Court outlines each of the three agreements, and then describes the summer of 2004

---

[1] The parties submitted a total of six "statements of fact" in support of the various motions for summary judgment ("MSJ").  Each statement of facts ("SOF") is referenced as follows: (1) Wexco's SOF in support of its Cross-Motion for Partial SJ Against ADM ("Wexco SOF ADM"); (2) ADM's SOF in Support of its MSJ ("ADM SOF"); (3) Wexco's Supplemental SOF in opposition to ADM's MSJ ("Wexco Supp SOF ADM"); (4) Wexco's SOF in support of its cross-motion for Partial SJ Against Shell ("Wexco SOF Shell"); (5) Shell's SOF in Support of its MSJ ("Shell SOF"); (6) Wexco's Supplemental SOF in opposition to Wexco's MSJ ("Wexco Supp. SOF Shell").  For each of these Statements of Fact, the Court refers to the final compilation, which includes the initial statement along with any objections.

The Court takes this opportunity to remind the parties that generally, on cross-motions for summary judgment, counsel should "confer on a format for Rule 56.1(a) statements that avoids unnecessary duplication while satisfying the requirements of the rule."  Allyn Z. Lite, N.J. Federal Practice Rules, Comment 2(f) to L.Civ.R. 56.1 (Gann 2008).  Had the parties followed this guidance, the duplication resulting from so many statements of fact could have been avoided.

Finally, the Court warns the parties against incorporating legal argument and conclusions into their various of Statements of Fact.  All parties are guilty of inserting self-serving, clearly-disputed "facts" or arguments into their Rule 56.1 statements.  See, e.g., Shell SOF ¶ 17; Wexco Supp SOF Shell ¶¶ 43-44.)  The "Rule 56.1 statement is no place for legal argument and "should set forth 'material facts as to which there exists or does not exist genuine issue."  Milligan v. Sentry Exteriors, Inc., No. 00-2279, 2005 WL 1229791, at *2 n.4 (D.N.J. May 24, 2005) (citing Local Civ. R. 56.1).

events that precipitated the present litigation.

### 1.     1999 Agreement

On May 12, 1999, ADM and Wexco entered into the first of three windshield wiper blade supply agreements ("1999 Agreement").[2]   (Wexco SOF ADM ¶ 1; Kim Dec., Exh. A. ("1999 Agreement").)[3]   This agreement consisted of a one-page Letter of Intent through which Wexco received the exclusive right to import and resell ADM's wiper blades into the United States. (1999 Agreement ¶ 2.)  In return, Wexco agreed to purchase at least 80% of a guaranteed minimum quantity of wiper blades each year.  (Id. ¶ 3.)  The minimum quantity began at 600,000 pieces in 1999, and then increased to 1.5 million, 3 million, and 4.5 million pieces each year for the next three years.  (Id.)  Finally, the 1999 Agreement included a provision whereby the parties would agree to re-negotiate the price of the wiper blades on a yearly basis.  (Id. ¶ 5.)  Thus, the parties agreed on exclusivity and a minimum purchase quantity and elected to determine the price each successive year rather than maintaining a fixed price for the duration of the four-year

---

[2] The agreement was actually between Wexco, Dong Yang Company, Ltd., and Daewoo Corporation.  Dong Yang Company was the predecessor to ADM, and all three parties were signatories to the agreement. Because these distinctions are of no consequence to the outcome of this litigation and in order to prevent confusion, the Court refers to the parties simply as ADM and Wexco.

[3] The briefs are referred to throughout this Opinion as follows: (1) ADM's MSJ ("ADM Br."); (2) Wexco's Cross-Motion for Partial SJ Against ADM ("Wexco Br. ADM"); (3) Wexco's Opposition to ADM's MSJ ("Wexco Opp. Br. ADM"); (4) ADM's Reply Brief ("ADM Reply Br."); (5) Wexco's Reply Brief in support of its Cross-Motion Against ADM ("Wexco Reply Br. ADM"); (6) Shell's MSJ ("Shell MSJ Br."); (7) Wexco's Cross-motion for Partial SJ Against Shell ("Wexco Br. Shell"); (8) Wexco's Opposition to Shell's MSJ ("Wexco Opp. Br. Shell"); (9) Shell's Reply ("Shell Reply Br."); (10) Wexco's Reply in support of its Cross-motion Against Shell ("Wexco Reply Br. Shell").

Additionally, the Court refers to declarations by the following persons: (1) Laura Goldbard ("Goldbard Dec."); (2) Stephen Schwartz ("Schwartz Dec."); (3) Henry Burnett ("Burnett Dec."); (4) In Kyu Kim ("Kim Dec."); and (5) Michael S. Kimm ("Kimm Dec.").

contractual term.  (Id.)

### 2.    2001 Agreement

On April 25, 2001, prior to the end of the 1999 Agreement, Wexco and ADM entered into a superseding second written agreement.  (Kim Dec., Exh. B ("2001 Agreement").)  The 2001 Agreement took effect for five years, with the option to renew the contract for an additional five years.  (Id. ¶ 4.)  It contained similar provisions to the 1999 Agreement.  For instance, Wexco agreed to purchase 70% (down from 80%) of a guaranteed minimum quantity each year, which reached 6 million pieces by the year 2005.  (Id. ¶ 3.)

### 3.    2003 Agreement

Finally, on September 1, 2003, ADM and Wexco entered into the contract that is at issue in the present litigation ("ADM Agreement").  (Wexco SOF ADM ¶ 3.; Kim Dec., Exh. C ("ADM Agreement").)  Much like its predecessor contracts, the ADM Agreement covered the exclusive supply of windshield wiper blades from ADM to Wexco.  Specifically, ADM agreed not to "license, sell, export or otherwise provide" windshield wiper blades to any third party, other than Wexco, in North America.  (ADM Agreement ¶¶ 1, 3(b).)   ADM also agreed "not to grant any right or appoint any dealer other than Wexco to import, sell or other distribute the product" in the United States, Canada or Mexico, and to use its best efforts to assure Wexco's continued exclusivity.  (Id.; Wexco SOF ADM ¶ 6.)  Finally, ADM agreed not to interfere with business originating from North America.  (ADM Agreement ¶ 3(c).)  In return, Wexco agreed to purchase at least 70% of a minimum amount of wiper blades, equal to 6 million units in Year 1 (2004) and increasing by 500,000 units each year for the duration of the five-year contract.  (Id. ¶ 4(a); Schedule B.)  Additionally, Wexco agreed to purchase a minimum of 15% of its yearly

4

amount in each quarter.  (ADM Agreement ¶ 4(a).)  Thus, in 2004, the ADM Agreement

obligated Wexco to purchase 6 million total units with a minimum of 900,000 units per quarter.

(Id.)  If Wexco failed to purchase the required minimum amount in any given year, ADM

retained the right to convert Wexco into a non-exclusive seller.  (Id. ¶ 4(b).)

The 2003 Agreement contained several other notable provisions.  First, like the 1999

Agreement, it provided for the parties to negotiate a new price for each succeeding year at least

30 days prior to the beginning of the next year.  (Id. ¶ 5(a).)  The new price had to take into

account changes in the product's specifications, changes to ADM's material costs, and changes

in the applicable exchange rate.  (Id.)  Additionally, it provided for certain information to be

treated as confidential.  (Id. ¶ 14(a).)

In the event of a breach, the non-breaching party had to provide notice, upon which the

breaching party had 30 days to cure.  (Id. ¶ 17(a).)  If the breaching party did not cure, the non-

breaching party retained the option to terminate the ADM Agreement.  (Id.)  Finally, the ADM

Agreement contained a merger clause which making it the complete agreement governing the

relationship of the parties, effectively superseding all previous agreements.  (Id. ¶ 19; Wexco

SOF ADM ¶ 14.)

### 4.    Termination of ADM Agreement

During the Summer of 2004, the ADM and Wexco relationship began to deteriorate,

eventually culminating in ADM's outright termination of the contract on October 24, 2004.

Throughout the summer, several relevant communications were exchanged:

- On June 7, 2004, Mr. Shane Park ("Park"), ADM's C.O.O., wrote to Wexco
  asking it to increase its June and July orders.  Park wrote, "[r]egarding the order
  for June and July, since there are only 620,000 wiper blade orders for this month

and it is so hard for us to keep the [factory] utilization over 60% and if you can increase the DB8 order [windshield wiper blades] from this month then it will be very helpful to overcome this very hard situation." (Kim Dec., Exh. J.)  Mr. Park also advised Wexco that ADM was encountering financial difficulties and would be applying for emergency bank loans.  (Id.)

• On July 2, 2004, Mr. Anthony Kim of ADM wrote to Wexco stating: "[W]e are awaiting your fixed order for our August's production."  (Kim Dec., Exh. H.)

• On July 21, 2004, Wexco's Paula Lombard ("Lombard") sent a responsive email explaining to ADM that Wexco had "on hand in our warehouse over 1 MILLION BLADES IN RETAIL PACKAGING plus 400,000 installer blades." (Kim Dec., Exh. I) (emphasis in original).  Ms. Lombard also advised ADM that it did not have warehouse room because of the blades currently on hand.  (Id.)

• ADM's Park replied on July 24, 2004, begging Wexco to make an order for wiper blades that would help ADM weather its financial storm.  Specifically, Park wrote: "[I]f you [Wexco] can make new forecasting and order for September at least 900,000 pc of wiper blades which will arrive on November, then I will be able to make the survival plan..." (Kim Dec., Exh. K.)  Park also asked for Wexco's "big help" and "kind support".  (Id.)

• Paula Lombard replied on July 26, 2004 attaching a forecast that ran to the end of the year but refusing to place any orders for more wiper blades.  (Kim Dec., Exh. L.)  Ms. Lombard reiterated the fact that Wexco had 1 million retail blades sitting in its warehouse, but gave a forecast to ADM of 350,00 pieces for September, 350,000 pieces for October, and 450,000 for November.  (Id.)

• On September 10, 2004, Park wrote to Lombard referencing Wexco's July 26th forecast – "Please refer following attached mail which you have sent on Jul. 27 about the forecasting of AB4 (Rain-X forecast for September is 350,000 pieces, October 350,000, November 450,000).  I am still waiting your kind order which I have persuaded the board about the sale forecast of ADM."  (Kim Dec., Exh. M.)

• That same day, September 10, 2004, Wexco wrote back to ADM to inform ADM that its relationship with Shell had come to an end.  (Kim Dec., Exh. N.)

• Finally, on October 20, 2004, ADM sent Wexco a letter invoking Paragraphs 16, 17, and 20 of the ADM Agreement and notifying Wexco that in thirty days, it would convert Wexco to a non-exclusive distributor.  ADM provided several reasons for terminating the contract, including: (1) Wexco's loss of the Shell Agreement; (2) the fact that Wexco failed to meet its 900,000 unit minimum purchase requirement for the quarter ending September 30, 2004, because it had

6

only purchased 746,600 units; (3) Wexco's failure to negotiate a new price for the year beginning September 1, 2004; (4) Wexco's failure to provide a three-month rolling forecast for October and November of 2004.  (Kim Dec., Exh. Q.)

Following ADM's October 20, 2004 letter, Wexco never sent a responsive letter nor did it cure its alleged defects.  Rather, on October 26, 2004, Wexco filed the present suit.

### B.    Wexco's Relationship with Shell

#### 1.    Shell Agreement

On July 15, 2000, Wexco and Shell entered into a two-year agreement, entitled "Windshield Wiper Supply Agreement ("Shell Agreement"), that would expire on September 15, 2002.[4]  Pursuant to the Shell Agreement, Wexco exclusively supplied Shell with premium-priced windshield wiper blades that were patented and manufactured by ADM.  (Shell SOF ¶ 2-5.) Shell then marketed those blades under the "Rain-X WeatherBeater" brand.  (Id. ¶ 3.)  On March 14, 2002, the parties decided to renew the Shell Agreement for another two years, thereby extending the end-date of the contract to September 15, 2004.  (Id. ¶ 7.)

Pursuant to the Shell Agreement, Wexco agreed to use "commercially reasonable efforts to exclusively supply" wiper blades to Shell.  (Schwartz Dec., Exh. 2 ("Shell Agreement") ¶ 3(a).)  Shell, in return, agreed not to purchase any high-end wiper blades (of the type listed in the contract) from any third party other than Wexco.  (Id. ¶ 3(d)(i).)  Shell, however, had "the right to purchase product from a third party" in the event that Wexco was "unable to supply [wiper blades] to [Shell] for any reason for a continuous period of thirty days."  (Id. ¶ 3(f).)  In the event of a material breach of the Shell Agreement, the non-breaching party "may notify in writing the

---

[4] The agreement actually involved Shell's predecessor, Blue Coral/Slick 50, Inc.  ("Shell SOF ¶ 1.)  However, that distinction is unimportant to the present motion and in order to prevent confusion, the Court shall refer to Shell as the counter-party to the 2000 Agreement.

other party in breach", thereby giving the other party 45 days to cure the breach.  (Id. ¶ 19(a).)  If the other party fails to cure, the non-breaching party could then send a thirty-day written notice of termination.  (Id.)

Additionally, Shell agreed to provide Wexco with a four-month rolling forecast outlining its anticipated need for wiper blades.  (Id. ¶ 7(a).)  Shell had the right to update the forecast on a monthly basis.  (Id.)  However, Wexco was not obligated to accept any Shell order that exceeded Shell's forecasted quantity by ten percent or more in any given month.  (Id. ¶ 8(c).)

Finally, the Shell Agreement contained a confidentiality provision preventing the disclosure of confidential information to third parties and a merger clause making it the sole and complete agreement of the parties with respect to the purchase of wiper blades.  ((Id. ¶¶ 16(a); 21(a).)  "Any amendments to [the Shell Agreement] shall be in writing and executed by both parties hereto."  (Id. ¶ 21(a).)

### 2.    Termination and Attempted Re-Negotiation of Shell Agreement

On March 3, 2004, Shell sent Wexco a notice terminating the Shell Agreement as of September 15, 2004.  (Shell SOF ¶ 8.)  Wexco confirmed receipt of the termination letter on March 16, 2004.  (Id. ¶ 9.)  The parties agreed, however, to engage in negotiations regarding a new contract that would take effect upon termination of the Shell Agreement.  (Id. ¶ 10.)

From March to August 2004, the parties engaged in negotiations regarding a new supply agreement ("New Agreement").  (Id. ¶ 11.)  As a preliminary term, Shell proposed that the New Agreement be non-exclusive so that Shell could use alternate suppliers.  (Id. ¶ 12.)  Wexco, however, insisted on being the exclusive supplier of all wiper blades for the retail market that would bear the Rain-X WeatherBeater name.  (Id. ¶ 14.)  After negotiating about the

disagreement over exclusivity, Shell's Global Procurement Manager for Car Care, Scott

Chadbourne, sought approval from Shell's Global Procurement Board, for a two-year contract

extension with Wexco for retail blades on a limited, non-exclusive basis.  (Id. ¶ 15.)  In June

2004, Shell's Global Procurement Board endorsed Chadbourne's and approved the two-year

contract extension with Wexco.  (Id. ¶ 16.)

       After the June 2004 endorsement of by Shell's Global Procurement Board, the parties

take drastically different views of the events that transpired.  Shell believes that the parties

reached agreement on key exclusivity provisions, but that Wexco's draft agreement did not

reflect those compromises.  (Id. ¶ 35-36).  Wexco, on the other hand, believes that the parties

reached oral agreement several times regarding specific contractual provisions in the contract but

that Shell's written contract proposals differed dramatically from those oral agreements.  (Wexco

SOF Shell ¶ 42.)

### 3.    Shell's Purchase of Blades From Alternate Supplier

       While the negotiations over a new supply agreement continued throughout the Summer of

2004, the parties also had disagreements over the scope of the existing Shell Agreement.  On

March 16, 2004, Wexco sent Shell a letter confirming expiration of the Shell Agreement on

September 15, 2004, but also advising Shell that orders for new blades would not be accepted

past June 15, 2004.  (Schwartz Dec., Exh. 9.)  Wexco believed that because the product required

a 90-day lead time, all orders had to be placed within 90 days of the end-date of the contract;

otherwise, they would require delivery past September 15, 2004, thereby placing delivery outside

of the scope of the contract.  (Wexco Supp. SOF ¶¶ 45-46.)  Wexco substantiated its position by

referring to the custom and practice in the trade.  (Id. ¶ 46.)  Shell, of course, saw it differently,

objecting that the actual custom in the trade required filling orders until the end date of the contract irrespective of the product's eventual delivery date. (Id.) The Shell Agreement itself contained no language requiring orders to be submitted more than 90 days prior to expiration. (Wexco SOF ¶ 21.)

On July 6, 2004, Shell placed a purchase order for 190,500 wiper blades with a required delivery date of October 6, 2004. (Shell SOF ¶ 18; Burnett Dec., Exh. J.) Wexco refused to accept the order, indicating that it had not been placed within 90 days of expiration of the Shell Contract. (Shell SOF ¶ 19, 20.) Specifically, on July 9, 2004, Paula Lombard, Wexco's President, informed Shell that "since this [July 6, 2004] order falls outside of the contract expiration date we have not been able to process it." (Shell SOF ¶ 25; Burnett Dec., Exh. E.) On August 2, 2004, Shell placed a second purchase order for 521,000 installer wiper blades and 162,500 retail wiper blades. (Shell SOF ¶ 34; Burnett Dec., Exh. N.) Wexco refused to accept this order as it too contemplated a delivery date past September 15, 2004. (Shell SOF ¶¶ 37-38.)

On August 31, 2004, Shell sent a letter advising Wexco that its "refusal to accept [Shell's] orders is a breach of the current Agreement and places Shell at risk of supply disruption." (Schwartz Dec., Exh. 14 at 2.) The letter further asks Wexco to confirm that it will place the July 6th and August 2nd orders and warns Wexco that a lack of confirmation will force Shell "to secure alternative sourcing." (Id. at 2.) In response, Wexco's counsel, Steven Pokotilow, sent a letter to Shell dated September 1, 2004, stating that under the terms of the Shell Agreement, Shell "had the right to purchase product for delivery after September 15, 2004 from any third party of its choosing since June 15..." (Shell SOF ¶ 44; Burnett Dec., Exh. Q.)

Finally, on September 3, 2004, Shell ordered and purchased – through its subsidiary Shell

Car Care International ("SCCI") – windshield wiper blades from Bext Co., Ltd. ("Bext").  While there is no dispute that Shell placed the September 3, 2004 order with Bext, the parties dispute Bext's relation to ADM.  Shell claims that Bext was an affiliate of ADM and the sole source of the blades that had been ordered by Shell's customers.  (Shell SOF ¶ 45.)  Wexco claims that Shell routed the purchase through its subsidiary, SCCI, in order to receive ADM windshield wiper blades that were routed through ADM's subsidiary Bext.  (Wexco SOF Shell ¶ 59.)  In this manner, according to Wexco, Shell and ADM could avoid directly transacting with each other.  And ADM claims that Bext is a completely independent entity that contracted with ADM to sell wiper blades in Europe and simply exercised that contractual authority by selling to SCCI, a European company.  (Kim Dec., ¶ 55.)

Having evaluated the evidence, the Court finds that Bext is clearly an agent of ADM.  In an August 27, 2004 email, ADM's Park advised Shell that Bext "is a temporary agent owned by the same owner of ADM21."  (Goldbard Dec., Exh. 14.)  Moreover, Park said that "Bext will not take ANY profit or commission from our [ADM's] business and the payment will go to ADM21 directly." (emphasis in original.)  In fact, ADM and Bext share the same bank account, and the owners of the two companies are brothers.  (Id.; Wexco SOF ADM ¶ 45.)  Sang Yong Park is president of ADM and a 35% stockholder of Bext.  (Goldbard Dec., Exh. 44; Deposition of In Kyu Kim ("Kim Dep.") 218: 5-16.)  Finally, Park stated that the reason for the use of Bext in the transaction was to avoid the "possible dangerous situation" that could accrue otherwise. (Goldbard Dec., Exh. 14.)  Other than declaring that the two companies are independent entities, ADM offers no evidence in support, and the Shane Park August 27, 2004 email is a clear admission that Bext actually served as an agent of ADM.  In fact, throughout the entire process,

Shell only communicated with Park even though it was purchasing the blades from Bext. (Goldbard Dec., Hall Dep. 71-74.)  The Court finds there is no issue of material fact as to the status of Bext; it was clearly an agent of ADM enlisted for the purpose of moving wiper blades from ADM to Shell.

**C.**      **ADM's Relationship with Shell**

The ADM Agreement contained no reference to Shell, and the Shell Agreement made no mention of ADM.  Yet the dispute in this case centers around the relationship between ADM and Shell that developed over the Summer of 2004.

Wexco and Shell were routinely in communication with each other.  (Wexco SOF ADM ¶ 35.)  In fact, Shell representatives visited ADM's factory operations in April 2004.  On July 18, 2004, ADM's Park sent Shell's Jay Hall an email advising that (1) ADM would "directly supply the wiper blades to meet the Shell's requirement from the time point of mutual agreement [sic]"; (2) ADM "is willing and able to supply the wiper blades at any sacrifice; (3) ADM "will take all responsibility all legal and business issue on the current contract of Wexco and [ADM] [sic]"; and (4) ADM "formally request that Shell serious consideration of these ADM21's plan and intention [sic]".  (Schwartz Dec., Exh. 41.)

Finally, on September 3, 2004, Shell placed an order for windshield wiper blades with Bext.  Orders that were delivered to Shell were sent by ADM to Bext, who then sent them through Shell's U.K. subsidiary SCCI to Shell itself.   (Wexco SOF ADM ¶ 42; Schwartz Dec., Exh. 27.)  As indicated earlier, the Court finds that there is no issue of material fact as to the status of Bext vis-a-vis ADM – the two companies are clearly linked and Bext functioned as an agent of ADM.

12

## II.  Standard

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  Id. at 324.  In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  Thus, the non-moving party may not rest upon the mere allegations or denials in its pleadings.  See Celotex, 477 U.S. at 324.  Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment.  See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

## III.  Discussion

### A.  Wexco and Shell

The Court first addresses the motions made by Wexco and Shell.  Shell moves for summary judgment on all claims.  Wexco cross-moves for (1) a declaration that Wexco was not in breach of the Shell Contract; (2) summary judgment on Count 7 finding that Shell committed a

13

material breach of the Shell Contract by disclosing confidential business information; and (3) summary judgment on Count 5 finding Shell liable for tortious interference with contractual relations.  In addressing arguments of law made with respect to the Shell Agreement, the Court applies the law of the state of New Jersey.[5]

### 1. Count Four – Tortious interference with prospective economic advantage

The common law cause of action for tortious interference with prospective economic advantage "protects the right to pursue one's business, calling, or occupation free from undue influence or molestation."  Printing Mart-Morristown v Sharp. Elecs. Corp., 116 N.J. 739, 563 A.2d 31, 36 (N.J. 1989).  Pursuant to New Jersey law, Wexco must establish five elements to prevail on such a claim: (1) Wexco had a reasonable expectation of an economic benefit or advantage; (2) Shell knew of Wexco's expectancy; (3) Shell intentionally and maliciously interfered with this expectancy; (4) there was a reasonable probability that Wexco would have realized the economic benefit in the absence of interference; and (5) Wexco suffered injury as a result of Shell's conduct.  Lightning Lube Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1991 ); Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co., 912 F. Supp. 747, 771 (D.N.J. 1995).  Shell moves for summary judgment as to this count; therefore, the Court views the evidence in the light most favorable to Wexco and draws all reasonable inferences in Wexco's favor.[6]

---

[5] "This Agreement, its terms and conditions and all business conducted hereunder shall be governed and interpreted under the laws of the State of New Jersey, United States of America, without regard to conflict of laws provisions."  (Shell Agreement ¶ 20(a).)

[6] Shell has not raised, and thus the Court does not pronounce upon, the soundness of a tortious interference with prospective economic advantage allegation that does not implicate a

Under the third element of this analysis, Plaintiff must prove that Shell interfered with malice – meaning that it acted intentionally "without justification or excuse." Sgro v. Getty Petroleum Corp., 854 F. Supp. 1364, 1183 (D.N.J. 1994).  The test asks whether or not Shell had the right to perform the act or set of actions that gave rise to the lawsuit.  "Tort liability for interference with prospective economic benefit arises when the conduct of the defendant is not in the reasonable exercise of an equal or superior right." Assoc. Group. Life, Inc. v. Catholic War Veterans, 120 N.J. Super. 85, 98, 293 A.2d 408, 415 (App. Div. 1971).  The crux of Shell's summary judgment motion hinges on this element – Shell claims that it acted in the proper pursuit of an equal or superior right by going to a third-party supplier after Wexco anticipatorily breached the Shell Agreement.  Wexco, on the other hand, claims that it acted properly in refusing to accept orders placed after June 15, 2004, and that Shell breached the contract by eventually purchasing wiper blades from ADM (through Bext).

Under New Jersey common law,

> [A]n anticipatory breach is a definite and unconditional declaration by a party to an executory contract – through word or conduct – that he cannot render the agreed upon performance.  If the breach is material, i.e., goes to the essence of the contract, the non-breaching party may treat the contract as terminated and refuse to render continued performance.

Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 340-41, 173 A.2d 258, 264-65 (1961).

---

prospective economic benefit.  The entirety of Wexco's factual underpinning for this allegation rests upon whether or not Shell's actions interfered with the ADM Agreement rather than with whether Shell's actions interfered with a prospective economic benefit unrelated to the ADM Agreement.  See D&D Associates, Inc. v. Board of Educ. Of North Plainfield, No. 03-1026, 2007 WL 4554208, at *22 (D.N.J. Dec. 21, 2007).  Given that the analyses concerning tortious interference with prospective economic advantage and tortious interference with contractual relations are essentially the same, however, the practical impact is that the Court would conduct the analysis regardless.

> A non-breaching party to a contract faced with the other party's anticipatory breach may choose to attempt to persuade the breaching party to retract his repudiation or to perform, though the non-breaching party is not required to do so.  He is entitled to treat the other party's repudiation as terminating the contract and relieving him of any future obligation of performance.  _____

Gaglia v. Kichner, 317 N.J. Super. 292, 299 (N.J. Super. Ct. App. Div. 1999).  The U.C.C. provisions, which govern the Shell Agreement, are similar.  Under U.C.C § 2-610, codified at N.J.S.A. § 12A:2-610, when a party repudiates a contract with respect to a future performance "the loss of which will substantially impair the value of the contract to the [other party]", the other party can "resort to any remedy for breach."  This includes the right to "cover."  N.J.S.A. §12A:2-711(1)(a).

Here, Shell properly exercised its right to purchase alternate wiper blades.  Wexco informed Shell on March 16, 2004, that no new orders for wiper blades would be accepted past June 15, 2004.  This statement functioned as one of two possibilities – either (1) Wexco had a contractual obligation to accept orders placed after June 15, 2004, in which case the March 16th letter served as a clear and unambiguous anticipatory repudiation of that obligation; or (2) Wexco had no obligation to accept orders placed after June 15, 2004, in which case the March 16th letter simply stated the obvious.  Either way, the practical import of the March 16th letter was the same – it put Shell on notice that as of June 15, 2004, Wexco would not accept orders for more wiper blades.  Thus, whether Wexco did or did not have the contractual obligation to accept orders past June 15, 2004 is immaterial to whether or not Shell could purchase blades from a third-party supplier.  Once Wexco advised Shell of its position, Shell had the right to purchase elsewhere.

This is exactly the position taken by Wexco's counsel, Steven Pokotilow, on September 1, 2004, when he wrote to Shell advising that Shell "had the right to purchase product for

delivery after September 15, 2004, from any third party of its choosing since June 15..." (Burnett Dec., Exh. Q.) Wexco cannot now be heard to claim that Shell's conduct proceeded without justification when Wexco (1) told Shell in May 2004 that it would not accept orders placed after June 15, 2004; (2) refused to accept the July 6th and August 2nd orders because they were placed after June 15, 2004; and (3) advised Shell on September 1st that since June 15, Shell had had the right to purchase blades from a third party. Wexco's position remained constant and uniform throughout the summer of 2004 – that Shell, after June 15, 2004, had no right to place a purchase order with Wexco and would need to find a third-party supplier if it needed replacement wiper blades.

The only remaining question is whether Shell had the right to purchase those replacement blades from ADM. It did. The parties agree that the wiper blades in question were patented and manufactured by ADM. Thus, Shell acted reasonably and predictably by approaching ADM about purchasing replacement blades. Regardless, Wexco cannot now take the position that Shell had the right to purchase blades after June 15, 2004 from any third-party supplier except for ADM. As an initial matter, Wexco's September 1, 2004 letter draws no distinction between ADM and "any third party." (Burnett Dec., Exh. Q.) But more importantly, the Court finds that allowing Shell to purchase blades from a third party but precluding it from reaching out to ADM would effectively nullify Shell's right to make the third-party purchase in the first place, because ADM is the only producer of the wiper blades in question. In sum, Shell acted reasonably in approaching the manufacturer and patent-holder of the wiper blades in question – especially given that those blades are the ones that Shell had promised to its customers.

The Court, therefore, finds it unnecessary to pronounce upon whether or not Wexco

17

committed an anticipatory breach through its March 16, 2004 letter or whether the Shell

Agreement permitted it to refuse any orders placed after June 15, 2004.[7]  Either way, Shell had

the right to purchase from ADM, a right that it exercised when it placed an order for replacement

wiper blades on September 3, 2004.[8]  Thus, Shell's motion for summary judgment as to Count 4

is granted.  Additionally, Wexco's cross-motion asking the Court to find that it did not breach the

Shell Agreement is denied as moot.

######      2.      Count Five – Tortious Interference with contractual relations

Under New Jersey law, to prevail on a claim for tortious interference with contractual

relations, Wexco must establish : (1) the existence of a contract; (2) that Shell actually interfered

with the contract; (3) that Shell was not a party to the contract but was rather a third party; (4)

that Shell defendant intentionally and maliciously, and hence unreasonably, interfered with the

relationship between the contracting parties; (5) that Shell's conduct caused plaintiff damage.

Halebian N.J. v. Roppe Rubber Corp., 718 F. Supp. 348, 360 (D.N.J. 1989). "[T]he difference

---

[7] Wexco makes three general arguments in opposition: (1) Shell waived the right to place orders past June 15, 2004 by failing to respond to the March 16th letter; (2) Wexco was never "unable to supply" blades, as required by ¶ 3(f) of the Shell Agreement, but rather had an inventory of 1 to 1.7 million blades between July and August 2004; and (3) the custom of the parties was such that all orders required a 90-day lead time, thus generating the June 15, 2004 cut-off date.  The Court, however, need not evaluate the legal sufficiency of these arguments because they are all irrelevant to the ultimate issue – whether Shell had the right to purchase wiper blades from a third party after June 15, 2004.

[8] Shell has alleged a counterclaim for breach of contract, stating that Wexco breached the Shell Agreement by failing to fill orders placed after June 15, 2004.  (Shell Answer ¶¶ 106-110.) Thus, the issue of whether or not Wexco committed a breach may eventually have to be determined.  However, Shell has not moved for summary judgment on its counterclaims, and therefore the Court does not see a need to reach that determination under the auspices of the present motion.  It is enough, for this motion, to find that Shell acted within its legal rights by going to a third-party to purchase replacement wiper blades.

between tortious interference with prospective contractual relations and tortious interference with performance of a contract is simply the existence of a contract, as opposed to plaintiff's reasonable expectation of an agreement." Coast Cities Truck Sales, 912 F. Supp. 747 at 772. Wexco and Shell cross-move for summary judgment on this Count.

The Court has already granted Shell's motion for summary judgment as to Count 4 on the ground that Shell had the right to purchase wiper blades from a third party after June 15, 2004 and specifically that Shell acted properly by purchasing from ADM. Thus, the allegations in Count 5 must also fail. Shell's motion for summary judgment as to Count 5 is granted, and Wexco's cross-motion for summary judgment is accordingly denied.

### 3.    Count Six – Common Law Fraud

Under New Jersey law, common-law fraud requires proof of five elements: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely upon it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (N.J. 1997). In the Second Amended Complaint ("SAC"), Wexco alleges that "[Shell] made representations regarding its good faith in negotiating new terms and conditions", and those representations were "made intentionally and with the knowledge that Wexco would rely on [them]." (SAC ¶¶ 72-74.) Thus, Wexco hinges this cause of action on Shell's alleged failure to negotiate a new contract in good faith.

The initial questions that arise regarding this allegation, therefore, are whether (1) the misrepresentation of an intention to negotiate in good faith can give rise to an action for common law fraud; and (2) if so, whether the alleged misrepresentation was material in this case. Having

scoured the caselaw, the Court is unaware (and Wexco has failed to cite) of a single case in

which a plaintiff initiated a common law fraud claim on the ground that the defendant

misrepresented his intention to negotiate in good faith.  Moreover, there is no independent cause

of action for a failure to negotiate in good faith.  See Restatement of Contracts § 205, comment

(c)(1981).  "The duty of good faith is...not imposed on parties until they have reached agreement

and does not bind them during their earlier negotiations."  E. Allen Farnsworth, 2 Farnsworth on

Contracts § 7.17 (2d ed. 2001).[9]  Thus, the Court will not allow Wexco to end-run its inability to

bring a claim for failure to negotiate in good faith by bringing the exact same claim under the

guise of a common-law fraud action.  As a matter of law, Wexco is precluded from bringing this

claim.  Accordingly, Shell's motion for summary judgment as to Count 6 is granted.

### 4.    Count Seven - Breach of Contract

Paragraph 16(b) of the Shell Agreement states as follows:

> In consideration of this Agreement and in the course of its fulfillment, and solely for
> the mutual benefit of the parties hereto, Supplier or Buyer may send or supply the
> other party with confidential information.  The information may be marked
> "Company Proprietary", or "Company Confidential" or another similar manner
> indicating its confidentiality.  This information may pertain to such items as price
> lists, financial information, contracts, product information, plans and design
> documentation relating to Buyer's business, Supplier's business, or the Product.

(Shell Agreement ¶ 16(b)).  Wexco alleges that Shell breached the Shell Agreement by disclosing

confidential information in violation of ¶ 16(b)'s confidentiality provision.  The parties cross-

---

[9] This does not include situations where the parties are contractually required to negotiate.
In those cases, a failure to negotiate in good faith does not give rise to a common-law fraud
action but rather gives rise to a direct breach of contract claim.  Channel Home Centers, Div. of
Grace Retail Corp. v. Grossman, 795 F.2d 291, (3d Cir. 1986) (finding that courts that have
considered the issue have held that "an agreement to negotiate in good faith...if otherwise
meeting the requisites of a contract, is an enforceable contract.)

move for summary judgment on this Count.

Wexco argues generally that Shell disclosed highly-sensitive information to ADM and "knew that Wexco would be disadvantaged if ADM were to learn it." (Wexco Br. Shell 16.) However, the evidence produced to substantiate this allegation fails to live up to the rhetorical hype. In support, Wexco cites to a single August 19, 2004 email in which Shell sent to ADM the outstanding purchase orders that Shell had with Wexco. (Schwartz Dec., Exh. 40.) The purchase orders themselves were never marked "Company Proprietary" or "Company Confidential." (Id.) Moreover, Stephen Schwartz admitted that he never once marked anything confidential with regard to Shell. (Burnett Dec., Schwartz Dep. 376:5-14.)

Not only did Wexco fail to mark the information in question with as "confidential", the information itself is indisputably not confidential. Contrary to Wexco's argument that the email contains "price, quantity, and product information of windshield wipers offered by Wexco to Shell", the email in reality simply forwards the product identification number as well as the number of cases ordered. Nowhere in the email is there any indication that Shell disclosed the price of the product. In the absence of any indication from Wexco that the identification number of a product and the number of cases ordered is Confidential, the Court finds that this does not present a material issue of fact for the jury.

As a final matter, the Court has already found that Shell acted properly by going to a third-party to make wiper blade purchases after June 15, 2004. Thus, the fact that Shell forwarded an order to the manufacturer containing the very amounts and types of blades that it needed is unsurprising and is not, without more, a violation of ¶ 16(b)'s confidentiality provision. Shell's motion for summary judgment is granted as to Count 7, and Wexco's cross-motion for

summary judgment is accordingly denied.

### 5.    Counts Eight and Nine – Civil Conspiracy

Finally, Wexco alleges dual civil conspiracy claims against Shell and ADM – accusing them of conspiring to interfere with prospective economic advantage and conspiring to interfere with contractual relations.  (SAC ¶ 82-90.)  With regard to this count, Shell correctly notes that a plaintiff cannot maintain a civil conspiracy claim without an actionable underlying tort.  (Shell MSJ Br. 13-14.)  Thus, "a conspiracy cannot be made the subject of a civil action unless something has been done which, absent the conspiracy, would give a right of action."  Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 516, 181 A.2d 774, 779 (1962); see also In re Orthopedic Bone Screw Products Liability Litig., 193 F.3d 781, 789 (3d Cir. 1999) ("we are unaware of any jurisdiction that recognizes civil conspiracy as a cause of action requiring no separate tortious conduct.")  Here, the Court has dismissed both of the underlying torts against Shell – for tortious interference with contractual relations and tortious interference with prospective economic advantage.  Thus, Counts 8 and 9 must be dismissed as well.  See, e.g., Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460, 497 (D.N.J. 1998).  Shell's motion for summary judgment as to Counts 8 and 9 is granted.

In sum, Shell is granted summary judgment as to all counts against it.  Shell did not act without reason in turning to ADM for its replacement supply of wiper blades.  The remaining question, however, is whether ADM acted improperly by reaching out to Shell.  That question implicates the remaining summary judgment cross-motions concerning Wexco and ADM.

### B.    Wexco and ADM

The Court therefore turns to the competing summary judgment motions made by Wexco

and ADM.  ADM moves for (1) summary judgment dismissing Wexco's claims in their entirety
and granting judgment on ADM's counterclaims; (2) dismissal for failure to join an
indispensable or necessary party; (3) dismissal due to forum non-conveniens.  Wexco cross-
moves for (1) a partial summary judgment finding that Wexco did not breach the ADM Contract;
(2) a partial summary judgment finding that ADM committed an anticipatory breach of the ADM
Contract; and (3) a stay of enforcement of the judgment in the amount of $291,689.30.

Before addressing the merits of the arguments before it, the Court finds it necessary to
comment on the many procedural defects afflicting ADM's briefs in this matter.  In short, they
fall far short of complying with the New Jersey Local Civil Rule 7.2.  First, ADM's brief in
support of its motion for summary judgment rings in at a shocking 72 pages, well above the 40-
page limit prescribed by Local Civil Rule 7.2(b).[10]  Next, Rule 7.2(b) also mandates the inclusion
of a table of contents and a table of authorities, both of which are noticeably absent from ADM's
moving brief.  ADM's reply brief, which doubles as an opposition to Wexco's cross-motion for
summary judgment, is 44 pages, leaving it shorter than the moving brief but still in contravention
of the length allowed by the Local Rules.  The proper procedure to employ before filing an over-
length brief is to obtain special permission from the Court "prior to submission of the brief."
Local Civ. R. 7.2(b).  This, clearly, is not the procedure ADM chose to follow.  Finally, both of
Mr. In Kyu Kim's Declarations – (1) submitted in support of ADM's motion for summary
judgment; and (2) submitted in support of ADM's reply brief – are replete with legal and factual
argument in clear violation of Local Civil R. 7.2(a), which warns parties to restrict affidavits to

---

[10] Even removing the eleven pages that ADM spends on its "statement of material facts",
the brief still comprises over 60 pages.

"statements of fact within the personal knowledge of the affiant" and to avoid including

"argument of the facts and the law."  The Court, in an effort to move this four-year old matter

along and promote judicial efficiency, does not strike ADM's briefs but merely warns ADM that

in the future, strict compliance with the local civil rules is expected.  However, as to Mr. Kim's

declarations, the Court strikes any paragraphs in the first declaration that contain legal or factual

argument, and the Court strikes Mr. Kim's second declaration in its entirety because of the

extensive amount of argument that it contains.

### 1.    ADM's Motion for Summary Judgment

### a.    Unenforceability of the New Jersey Contract

First, ADM argues that the ADM Agreement is invalid and unenforceable because the

parties never agreed on an essential term – price.  (ADM MSJ Br. 31.)  ADM hinges its theory on

the fact that the parties included a clause in the contract obligating them to re-negotiate the

product price each year.  Section 5(a) of the ADM Agreement reads as follows:

> No less than thirty (30) days prior to the commencement of each succeeding Business
> Year, the Product prices for the succeeding year shall be negotiated between the
> parties, taking into account changes in the Product's specifications and/or ADM's
> material costs that are reasonably related to the pricing of the Product, as well as
> changes in the applicable exchange rate.

(ADM Agreement ¶ 5(a).)  Thus, according to ADM, the ADM Agreement was nothing more

than an "agreement to agree in the future", and therefore it is not a valid contract.  (ADM MSJ

Br. 32.)  ADM's argument fails as a matter of law.

Article 2 of the Uniform Commercial Code ("UCC"), adopted in New Jersey as N.J.S.A.

12A:2-101 et seq., governs the ADM Agreement because the Agreement is a contract for the sale

of goods.  See generally Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (1997).  Under

U.C.C. § 2-305, codified at N.J.S.A.12A:2-305, the parties "if they so intend can include a contract for sale even though the price is not settled." <u>N.J.S.A.</u> 12A:2-305(1). Where, however, "the parties intend not to be bound unless the price be fixed or agreed and it is not fixed or agreed there is no contract." <u>N.J.S.A.</u> § 12A:2-305(4). In <u>Truex v. Ocean Dodge, Inc.</u>, 529 A.2d 1017, 1021 (N.J. Super. Ct. App.Div. 1987), plaintiff had orally agreed to purchase a vehicle from the defendant for $4,985 minus the trade-in value of plaintiff's used vehicles. Defendant challenged the validity of the contract based upon the parties' lack of agreement as to the trade-in value of the vehicles. <u>Id</u>. The Court, citing U.C.C. §2-305, found that the defendant could not "rely upon the parties lack of agreement on the value of the trade-in vehicles for concluding there was no contract." <u>Id</u>. Rather, under U.C.C. § 2-305, the parties were free to intend a contract for sale that did not include a settled price term. <u>Id</u>.

So too here. The ADM Agreement explicitly provides for yearly price negotiation. Moreover, there is no dispute that the parties reached agreement as to a price in 2004. ADM, without factual basis, asserts that the agreed-upon price was dictated by Wexco, but the fact remains that the parties reached agreement concerning a price for which, over the course of the year, ADM shipped many millions of blades to Wexco. Furthermore, this same type of price provision existed in the 1999 Agreement, and ADM never once lodged an objection to that contract. In fact, rather than objecting, ADM acceded to the exact same price-negotiation provision in the 2003 ADM Agreement. Only now, at the onset of litigation, does ADM argue that a missing price term rendered the ADM Agreement invalid. Because it presents no facts to indicate that the parties did not intend to enter into an open-price agreement and presents no facts indicating that the parties failed to reach agreement as to price, ADM's motion to deem the

contract invalid lacks merit.

Finally, ADM's argument as to Wexco's allegedly bad-faith negotiation over the price also fails to invalidate the contract on this motion for summary judgment. Generally, intent and bad faith are issues for a jury and are not ripe for determination on a summary judgment motion. Here, however, ADM offers no evidence (other than unsupported assertions) and no facts to back up any claim it might have as to a lack of intent to enter into the 2003 Agreement or as to Wexco's lack of good faith in negotiating the 2004 price.[11] Moreover, bad faith would not serve to invalidate the contract; it would merely give ADM a claim for a breach of the covenant of good faith and fair dealing. Thus, the Court finds – as a matter of law – that the 2004 contract is valid under the UCC and denies ADM's motion to declare the contract unenforceable.

### b.     Misrepresentation, Failure of Consideration, and Frustration of Purpose

Next, ADM asks raises a panoply of contract invalidation arguments – all revolving around Wexco's failure to reach agreement on a new contract with Shell. ADM alleges that Wexco should have advised it of the status of negotiations with Shell, specifically asserting that Wexco was under a "duty of good faith to advise ADM, the party supplying the Rain-X blades, that the agreement [Shell Agreement] would be terminated in six months." (ADM Br. 48.) Under ADM's theory, Wexco's failure to inform ADM that Wexco's contract with Shell was set to terminate on September 15, 2004, and Wexco's refusal to forward Shell's July 6, 2004 and

---

[11] The only evidence offered consists of unsupported assertions by In Kyu Kim. (Kim Dec. ¶¶ 49-50.) Even Kim acknowledges that "Wexco added approximately 4 percent to ADM's previous per unit cost" during the negotiations over the 2004 price. (Id. ¶ 50.) Either way, Kim's assertion that "Wexco used threats to obtain a result" and "unilaterally set" the 2004 price are unsupported by any evidence and are insufficient to create an issue of fact for the present motion.

August 2, 2004 orders to ADM are sufficient to invalidate the ADM Agreement.  This is because, according to ADM, the "principle purpose of the 2003 Agreement was to supply the AB4 blades to Shell."  (ADM Reply Br. 38.)  None of these arguments hold merit.

As a matter of law, the Shell Agreement was not consideration for, nor was it the purpose of, the ADM Agreement.  The 2003 Agreement between ADM and Wexco remained entirely separate from Wexco's agreement with Shell.  It made no mention of Shell, and the Shell Agreement made no reference to ADM.  ADM acknowledges as much, stating that the "two agreements Wexco had made with ADM and separately with [Shell] were not interlinked by their own language."  (ADM MSJ Br. 38.)  In fact, ADM signed its first contract with Wexco well before Wexco had established a relationship with Shell.  Thus, setting aside the question of whether Wexco did or did not tell ADM about its contract discussions with Shell over the summer of 2004 – a fact that is disputed – the fact of the matter is that even if Wexco failed to inform ADM of the state of the negotiations, that fact would not operate to void the completely separate contract between ADM and Wexco.  Not one piece of evidence indicates that the purpose of the ADM Agreement was to supply windshield wiper blades to Shell.

Rather, Wexco and ADM entered into a contract for the sale of goods whereby ADM allowed Wexco to be the exclusive supplier of windshield wiper blades in North America so long as Wexco met the material purchasing terms of the ADM Agreement.  The fact that Wexco failed to reach agreement with a third-party – Shell – is completely incidental to operation of the ADM Agreement and does not give ADM a basis upon which to declare the contract invalid.  To the extent that ADM argues for invalidating the ADM Agreement on the basis of frustration of purpose, failure of consideration, or misrepresentation – all stemming from Wexco's failure to

27

reach agreement on a new contract with Shell – those arguments are all denied.

### c.  Breach of Contract

Next, ADM asks the Court to grant summary judgment as to Wexco's breach of contract allegation.  First, ADM argues that Wexco anticipatorily breached the ADM Agreement by failing to order the minimum quantity of 900,000 wiper blades for the quarter ending August 31, 2004.  During the third quarter of 2004, ADM representative Paula Lombard admitted in her deposition that Wexco had failed to purchase 900,000 pieces.  (Kimm Decl., Exh. I (Lombard Dep.) at 473:9-25.)   The third quarter of 2004 is the period ending September 30, 2004.  However, Wexco argues that it is undisputed that it ordered sufficient quantities of blades for the entire year, including for the quarter ending August 31, 2004.  (Wexco Opp. Br. ADM 21.)  The parties, therefore, take divergent views on what "quarter" controls the minimum quantity analysis – the quarter ending August 31, 2004 or that ending September 30, 2004.  The ADM Agreement specifies that the "Business Year" controls the analysis, and the Business Year is defined as beginning on September 1, 2003.[12]  (ADM Agreement ¶¶ 1, 4(a).)  Thus, the third quarter of the Business Year is the quarter ending August 30, 2004.  Neither party presents evidence regarding Wexco's minimum purchases in that quarter, with Wexco simply offering the unsupported assertion that it made the required purchases.  (Schwartz Dec. ¶ 82.)  Because neither party has presented any actual evidence, the Court makes an inference in the light most favorable to Wexco (this is ADM's motion) and finds that an issue of material fact arises as to whether sufficient

---

[12] The Court notes that § 4(a) of the ADM Agreement refers to Business Year in the first sentence and simple "the year" in the second sentence.  In light of the fact that § 4(b) also refers to the Business Year, the Court reads "the year" as indicating Business Year and not calendar year.  The Business Year begins on September 1, 2003, because that is the effective date of the ADM Agreement.

quantities of wiper blades were purchased by Wexco during the three months preceding August 30, 2004.

Assuming *arguendo* that Wexco failed to make the required minimum purchases, the next question that arises is whether that failure constituted an anticipatory breach.  Under N.J.S.A. § 12A:2-610, the repudiation of a contract, sufficient to create an anticipatory breach, must "substantially impair the value of the contract" and "can result from action which reasonably indicates a rejection of the continuing obligation."  N.J.S.A. § 12A:2-610; Comment 1 on N.J.S.A. § 12A:2-610.  The emails sent by Paula Lombard in July and August 2004 do not reasonably indicate a rejection of Wexco's continuing obligations under the ADM Agreement. Nothing about those emails indicates that Wexco is going to fail to meet its minimum purchasing quota.  In fact, Ms. Lombard's July 26, 2004 email attaches a three-month purchasing forecast.

Next, even assuming that the Lombard emails reasonably indicate an anticipatory repudiation, ADM would still have to prove that the breach substantially impaired the value of the contract.  Section 4(a) of the ADM Agreement reads as follows: "In the event Wexco fails to purchase the quantity [as per 4a] of the Product in each market in any Business Year...ADM shall have the right to convert the rights of Wexco to a non-exclusive right."  Thus, Section 4(a) does not refer to a failure to purchase the minimum quantity in each three-month period as giving rise to a right of conversion but rather only speaks to a failure to purchase the requisite yearly amount.  As such, an issue of material fact arises as to whether – assuming Wexco failed to make the required quarterly purchases – that failure "substantially impair[ed] the value of the contract." As a matter of law, the parties to the contract did not think enough of a failure to meet a three-month minimum to make it a part of ADM's right to convert.  The Court finds as a matter of law

that even in the event of anticipatory repudiation, the Lombard emails do not substantially impair the value of the contract.

Finally, and most importantly – with respect to the issue of anticipatory repudiation – is the fact that ADM began negotiating with Shell at least as early as July 18, 2004, when ADM's Shane Park wrote an email to Shell offering to supply wiper blades "at any sacrifice" and to take all legal responsibility regarding the issue of the ADM Agreement with Wexco.  (Schwartz Dec., Exh. 41.)  Park specifically offered to supply wiper blades to meet Shell's requirement "from the time point of mutual agreement."  (<u>Id.</u>)  Thus, even if ADM could prove that Wexco failed to meet the quarterly purchasing requirement, that it anticipatorily breached the contract by clearly indicating that it would not purchase 900,000 pieces, *and* that the failure to meet the purchasing minimum constituted a substantial impairment of the ADM Agreement – ADM still has to prove that it reached out to Shell after the anticipatory breach and not before it.

Next, even if Wexco's failure to make the minimum purchases did not amount to an anticipatory repudiation, ADM argues that it gave sufficient notice to Wexco, throughout the summer of 2004, of Wexco's many actual breaches of the ADM Agreement.  Paragraph 17(a) requires a non-breaching party to give notice to a party in breach, upon which the breaching party has 30 days to cure the breach.  (ADM Agreement ¶ 17(a).)  ADM argues that it fulfilled the notice provisions of Paragraph 17(a) by giving Wexco adequate time to cure prior to the October 20, 2004 letter.  This argument misses the mark.  Paragraph 20 of the ADM Agreement sets forth very specific parameters as to what constitutes adequate notice:

> All notices, requests, demands, instructions, consents or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered personally, (ii) transmitted by

30

> prepaid telegram, telex or facsimile, (iii) mailed postage prepaid by certified mail,
> return receipt requested, (iv) sent by a nationally recognized express courier service,
> postage or delivery charges prepaid, at the address hereinafter provided, or to such
> address as the parties may advise each other in writing from time to time.

(ADM Agreement ¶ 20.)  ADM claims that it sent numerous emails to Wexco about Wexco's failure to fulfill its side of the ADM Agreement; however, it is clear, as a matter of law, that none of the email or other communications that ADM purports to have sent constitute adequate notice under Paragraph 20.

Furthermore, even if the form of notice had sufficed to meet Paragraph 20's requirements, the substance of the notice failed to convey the fact that ADM believed Wexco to be in breach. None of ADM's emails articulate the basis for breach, and none purport to constitute a notice of breach or a notice of termination.  Rather, until ADM's October 20, 2004 letter, the ADM Agreement remained in full effect and both parties were equally bound by its terms.  See, e.g., Bak-A-Lum Corp. of America v. Alsco, Inc., 173 A.2d 444, 447 (N.J. Super. Ct. Ch. Div. 1961) (finding that agreement is not terminated until non-breaching party manifests his intention to terminate by giving notice).  Here, too, ADM's failed to give notice of breach and in the absence of anticipatory repudiation, ADM cannot rely upon Wexco's alleged actual breaches to substantiate its actions.

In sum, the Court finds that at this stage ADM cannot prevail on the doctrine of anticipatory breach because of a multitude of factual issues, and ADM also cannot take refuge in the notice provisions of the ADM Agreement.  As to this count, ADM's motion for summary judgment is accordingly denied.

#### d.        Tortious Interference Claims

ADM moves for summary judgment as to both tortious interference counts (Counts 1 and 2 of the SAC).  Like Shell, ADM argues that its actions were justified and therefore are not actionable under a tortious interference claim.  For the reasons set forth above (regarding the breach of contract claim), this motion for summary judgment is also denied.

#### e.        Failure to Join a Necessary Party

ADM moves to dismiss the complaint for Wexco's failure to join Bext, a necessary party, pursuant to Fed. R. Civ. P. 19.  ADM bears the burden of proving that a non-party is indispensable to the adjudication of the action.  Am. Home Mortgage Loan Corp. v Commonwealth Land Title Ins. Co., No. 07-1257, 2007 WL 3349320, at *3 (D.N.J. Nov. 9, 2007) (Linares, J.) (citing Fed. Loan Mortgage Mortgage Corp. v. Commonwealth Land Title Ins. Co., No. 92-5255, 1993 WL 95494, at *5 (E.D.Pa. March 31, 1993).  Courts considering a Rule 19 motion must employ a two-step inquiry.  First, the court must determine whether the absent party is "necessary" to the action.  Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007).  Under Fed. R. Civ. P. 19(a), a party is necessary if "either (1) the present parties will be denied complete relief in the absence of the party to be joined, or (2) the absent party will suffer some loss or be put at risk of suffering such a loss if not joined."  Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 158 F.3d 170, 175 (3d Cir. 1998) (emphasis in original).

The Court finds that neither of the Rule 19(a) situations is present here.  This action involves two contracts – one between Shell and Wexco and the other between ADM and Wexco – and neither contract refers to Bext in any fashion.  Thus, no party to the action will be denied complete relief in the absence of Bext entering the case.  In fact, if Bext is independent (as ADM

claims), then Wexco has no claim against it because Wexco and Bext never entered into a contract with each other.  If Bext is not independent (as Wexco claims) then Wexco has a claim against ADM for creating a sham entity to avoid its contractual obligations.  Under neither scenario does Wexco have a claim against Bext and under neither scenario does Bext suffer harm by not being joined into this action.

Alternatively, ADM also notes that Bext is "beyond U.S. courts jurisdiction and subpoena power."  (ADM Br. 62.)  Under Rule 19(a), that would render joinder of Bext "infeasible."  Rule 19(b) instructs a court to evaluate, in the instance where joinder is infeasible, whether "in equity or good conscience the action should proceed among the parties before it."  Assuming *arguendo* that Bext is a necessary party but that joinder is infeasible, this action can continue without Bext's presence.  Any judgment rendered without Bext will not be prejudicial to the parties in the case.

ADM's motion to dismiss for failure to join a necessary party is denied.

### f.    Forum Non Conveniens

A court may dismiss a case based on the doctrine of forum non conveniens "when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would 'establish oppressiveness and vexation to a defendant . . .out of all proportion to the plaintiff's convenience' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981) (quoting Koster v. American Lumbermens Mutual Casualty Co., 330 U.S. 518, 524, 67 S.Ct. 828, 831-32, 91 L.Ed 1067 (1947).  In this case, the analysis is substantially affected by a forum selection clause.  Section 18 of the ADM

Agreement states that "any and all disputes between the parties shall be resolved in the Federal or State courts located in Morris County, New Jersey." (ADM Agreement ¶ 18.)

Under federal law, forum selection clauses are "*prima facie* valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972). "A forum selection clause is 'unreasonable' where the defendant can make a 'strong showing' either that the forum thus selected is 'so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court', or that the clause was procured through 'fraud or overreaching.'" Foster v. Chesapeake Ins. Co., 933 F.2d 1207, 1219 (3d Cir. 1991) (quoting M/S Bremen, 407 U.S. at 15, 18)(internal citations omitted).

ADM does not argue that the forum selection was obtained by fraud. Nor does it make a strong showing that it would be deprived of its day in Court by continuing to litigate this matter in New Jersey. Most of ADM's argument revolves around the fact that Bext is not in this case and that Bext is located overseas. As to the former issue, the Court has already denied ADM's motion for dismissal based on non-joinder of a Bext. And as to the latter issue, the fact that documents and witnesses of a non-party are located overseas is not remotely sufficient to satisfy ADM's burden with respect to overriding a valid forum selection clause. As a result, the Court denies ADM's motion to dismiss based on the doctrine of forum non conveniens.

### g.      ADM's Counterclaim

Finally, ADM moves for summary judgment in the amount of $291,689.30 for goods that Wexco received but for which it never remitted payment. Wexco concedes this point but asks the Court to stay enforcement of the claim pursuant to Fed. R. Civ. P. 54(b) until the etnire

matter is resolved. Wexco's assertion that it is entitled to an offset in an amount greater than

$291,689.30 does not preclude this Court from granting partial summary judgment as to this

counterclaim. <u>Electro-Catheter Corp. v. Surgical Specialties Instrument Co., Inc.</u>, 587 F. Supp.

1446, 1456-67 (D.N.J. 1984). Thus, the Court grants partial summary judgment to ADM in the

amount of $291,689.30, but the Court stays enforcement of this judgment, pursuant to Fed. R.

Civ. P. 54(b), until all remaining claims between ADM and Wexco are resolved.

ADM also moves for summary judgment in the amount of $350,993.10 for four August

10, 2004 purchase orders placed by Wexco but never accepted. Wexco responds that the parties'

custom and practice involved the submission of a purchase order by Wexco followed by a timely

confirmation response from ADM. (Wexco Opp. Br. ADM 26-27.) Wexco claims that ADM

never confirmed the four August 10, 2004 purchase orders and thus the orders are not valid. (<u>Id</u>.)

ADM fails to respond to Wexco's arguments in opposition. The ADM Agreement does not

specify procedures for the placement and acceptance of orders. Thus, because of ADM's failure

to address Wexco's specific counter-arguments and because of the ambiguity of the ADM

Agreement regarding this specific issue, the Court denies ADM's motion for summary judgment

as to the August 10, 2004 purchase orders.

### 2.      Wexco's Cross-Motion

The Court now turns to Wexco's cross-motion for partial summary judgment.

### a.      Anticipatory Breach

First, Wexco asks for partial summary judgment finding that ADM committed an

anticipatory breach of the ADM contract through its various contacts with Shell throughout the

summer of 2004. Specifically, Wexco points to a July 18, 2004 email and a July 20, 2004 email

– both of which were sent from ADM to Shell.  In the first, ADM offered to supply "the windshield wiper blades at any sacrifice."  (Schwartz Dec., Exh. 41.)  And in the second, ADM offered to sell Shell over one million wiper blades per month from August 15th.  (Schwartz Dec., Exh. 44.)  Then, on September 3, 2004, Shell placed a purchase order with Bext.  Because Wexco claims (and this Court agrees) that Bext actually served as ADM's agent, this September purchase order also allegedly constituted an anticipatory repudiation of the exclusivity provisions in the ADM Agreement.  Wexco's argument fails and indicates a flawed understanding of the doctrine of anticipatory breach.

As discussed earlier, for Wexco to claim that ADM committed an anticipatory breach, Wexco must make a factual showing that ADM's actions provided a reasonable indication that it would repudiate the ADM Agreement.  Comment 1 on N.J.S.A. 12A:2-610.  Wexco cannot make this showing, because it did not know about any of the above emails until well after they were sent.  Until Wexco received the misdirected email of September 29, 2004, it had no idea that ADM had sold windshield wiper blades to Shell.  Then, as of September 29, 2004, if Wexco reasonably believed that ADM was committing an anticipatory breach, Wexco had the option to repudiate the contract and refuse to continue performance.  Instead, Wexco's principal, Stephen Schwartz, admits that Wexco never once gave ADM any type of notice – throughout 2003 and 2004 – that it had breached the ADM Agreement.  (Kimm Dec., Exh. L (Schwartz Dep. at 588:7-16.))  Rather, Wexco continued to perform under the contract until ADM terminated it one month later, on October 20, 2004.[13]

---

[13] Whether Wexco actually performed under the contract is clearly a contested issue.  The bottom line for this analysis, however, is that Wexco did not repudiate the ADM Agreement but rather gave every indication that it was still in full force and effect.

Wexco's motion for partial summary judgment on the issue of anticipatory breach is

therefore denied – the facts are undisputed that the first indication Wexco had of an alleged

business relationship between ADM and Shell arose on September 29, 2004, after which it chose

not to repudiate the contract.  Now, several years after-the-fact, Wexco cannot claim that actions

about which it had no contemporaneous knowledge (the July emails) or actions about which it

took no action (the September 29, 2004 email) constituted anticipatory breach sufficient to render

a verdict in its favor.

### b.    Wexco's Performance Under the ADM Agreement

Next, Wexco moves for a partial summary judgment finding that it did not breach the

ADM Agreement.  Wexco claims that it is undisputed that for the first three quarters of the first

year of the contract, beginning September 1, 2003, it purchased the minimum amount of

windshield wiper blades from ADM.  (Wexco Br. ADM 8.)  The Court has already found that the

issue of whether or not Wexco purchased the minimum quarterly amount of blades for the

quarter ending August 31, 2004, presents a disputed issue of material fact.  See Section III.B.1.c,

supra.  Thus, the Court denies Wexco's motion for partial summary judgment as to this issue.

Wexco makes the additional argument that because ADM had already allegedly

contracted with Shell to supply it with blades on August 26, 2004, the whole issue of Wexco's

minimum volume of purchases is irrelevant.  (Wexco Reply Br. ADM 9.)  Thus, Wexco argues

that ADM had already breached the contract and that the entire issue of Wexco's volume during

the fourth quarter, therefore, "is of no consequence."  (Id.)  Again, this argument simply does not

hold up.  As of August 26, 2004, Wexco did not know about any relationship between ADM and

Shell.  Nor had ADM sent Wexco any sort of a breach letter or notice of termination.  Rather, as

of the end of that quarter, the ADM Agreement remained in full force and effect and Wexco had

a contractual obligation to purchase 900,000 blades.  Wexco cannot use an after-the-fact claim of

breach to substantiate any failure to comply with the ADM Agreement.  Accordingly, Wexco's

motion for partial summary judgment is denied and in the event that Wexco did not make the

required minimum purchases for the quarter ending August 31, 2004, it cannot use as a defense

the fact that ADM had already contracted with Shell.

### c.    Disclosure of Confidential Information

Section 14(a) of the ADM Agreement reads as follows:

> "A party hereto may send or supply another party with confidential information.  The
> information may be marked "Company Proprietary", or "Company Confidential" or
> another similar manner indicating its confidentiality.  This information may pertain
> to such items as price lists, financial information, contracts, product information,
> plans and design documentation relating to Wexco's business, ADM's business, or
> the Product [windshield wiper blades]."

(ADM Agreement ¶ 14(a).)  Wexco argues that ADM breached this section of the ADM

Agreement by revealing confidential information to Shell.[14]  Wexco identifies a single email sent

on July 20, 2004, from an ADM employee to Shell advising Shell that ADM had recently

received "a strange request" from Wexco "to produce different specification of rain-x products."

---

[14] Having scoured Wexco's SAC, the Court finds no count alleging breach of contract
against ADM for disclosure of confidential information.  Count 7 makes this allegation but only
as to Shell (SAC ¶ 76-81.)  Given that Wexco has argued for summary judgment on this count
and ADM has not raised the issue of Wexco's failure to actually plead the claim, the Court treats
the argument as an unopposed motion for leave to amend the Complaint pursuant to Fed. R. Civ.
P. 15(a).  Sola v. Lafayette College, 804 F.2d 40, 45 (3d Cir. 1986) (when plaintiff argues, in
opposition to summary judgment, a claim not in the complaint, court should treat the argument as
a motion to amend). Noting Rule 15(a)'s liberal mandate that "leave shall be freely given when
justice so requires", the Court grants the motion to amend, adds a breach of contract claim
against ADM, and addresses the cross-motions for summary judgment on the newly-added claim.

(Wexco Br., Schwartz Dec., Exh. 38.)  The email also advises Shell that the request is for wiper blades without the "rain-x" mark on the wiper blade and that the total amount of the order is 190,500 blades.  (Id.)  ADM argues that not only does the email fail to identify confidential information, Wexco never marked the information conveyed by the email as "Company Proprietary" or "Company Confidential."  This Court agrees.

The information contained in the email had not been designated confidential.  While a directive to produce a new variety of rain-x products is generally related to "product information" and "Wexco's business", both of which are listed in ¶ 14(a)'s confidentiality provision, there is no indication that the information was clearly confidential, that Wexco had designated the information confidential, or that ADM knew the information was confidential.  Rather, whether or not the information contained in the July 20, 2004 email fell within the confidentiality provisions of ¶ 14(a) and whether ADM knew of the information's confidential nature are questions of fact for the jury.  Thus, Wexco's motion for partial summary judgment as to ADM's alleged breach of contract based upon disclosure of confidential information is denied.  And ADM's cross-motion for summary judgment on this count is also denied.

## IV.    Conclusion

In conclusion, the Court finds that Shell acted reasonably and properly in reaching out to a third-party supplier, in this case ADM, to purchase wiper blades after June 15, 2004.  Accordingly, Shell's motion for summary judgment is granted as to all claims.  However, the fact that Shell had the legal right to reach out to ADM does not mean that ADM had the right to reach out to Shell.  Rather, the Court denies ADM's motion for summary judgment, finding material issues of fact as to ADM's claim of anticipatory repudiation and finding that ADM failed to give

adequate notice prior to its October 20, 2004 notice of termination.  The Court also denies

Wexco's motion for partial summary judgment against ADM, finding that Wexco cannot take

shelter in an anticipatory breach theory and also finding that an issue of fact precludes the entry

of partial summary judgment as to Wexco's non-breach of the ADM Agreement.  Finally, the

Court grants as unopposed ADM's motion for summary judgment in the amount of $291,680.30

but stays enforcement of the judgment until all claims in the present action – between ADM and

Wexco – are resolved.

      An appropriate Order accompanies this Opinion.


Dated: December 30, 2008            /s/ Jose L. Linares        
                                                           United States District Judge